IN THE
UNITED STATES COURT OF APPEALS
FOR THE
ELEVENTH CIRCUIT
ATLANTA, GEORGIA

_____

APPEAL NO: 20-13891

_____

UNITED STATES OF AMERICA
Plaintiff/Appellee

Versus

EMIRO HINESTROZA-NEWBBOOLL
Defendant/Appellant

_____

APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

8:18-cr-00594-SCB-JSS-1

_____

INITIAL BRIEF

_____

MARK O'BRIEN, ESQUIRE
O'Brien Hatfield Reese, P.A.
Bayshore Center
511 West Bay Street, Suite 330
Tampa, Florida 33606
(813) 228-6989
Florida Bar No. 0160210
COUNSEL FOR APPELLANT

APPEAL NO: 20-13891

*United States of America v. Emiro Hinesttroza-Newbbooll*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26-1, I hereby certify that the persons listed below are interested in the outcome of this case:

1. Amador, Pedro, Co-defendant's Attorney;

2. Baeza, Daniel M., Assistant United State Attorney;

3. Brunvand, Bjorn E., Co-defendant's Attorney;

4. Bucklew, Hon. Susan C., United States District Judge;

5. Dee, David A., Co-defendant's Attorney;

6. DeRenzo, Nicholas G., Assistant United States Magistrate Attorney;

7. Elm, Donna Lee, former Federal Public Defender;

8. Goodin, Toni A., Assistant United States Attorney;

9. Hernandez, Daniel M., Esq.;

10. Hinestroza-Newbbooll, Emiro, Defendant/Appellant;

11. Lopez, Maria Chapa, United States Attorney;

12. Martinez, Victor D., former counsel for Defendant/Appellant;

13. Nate, Adam J., former counsel for Defendant/Appellant (AFPD);

14. O'Brien, Mark J., Attorney for Defendant/Appellant

15. Palmero, Thomas N., Assistant United State Attorney;

I

16. Rhodes, David P., Assistant United States Attorney, Chief, App. Division;
17. Rhodes, Yvette, Assistant United States Attorney;

18. Sansone, Hon. Amanda A., United States Magistrate Judge;

19. Skuthan, James T., Acting Federal Public Defender;

20. Sneed, Hon. Julie S., United States Magistrate Judge; and

21. Zimmerman, Warren A., former counsel for Defendant/Appellant.

No publicly traded company or corporation has an interest in the outcome of this appeal.

**STATEMENT REGARDING ORAL ARGUMENT**

The Appellant, EMIRO HINESTROZA-NEWBBOOLL, does not request oral argument. It is respectfully submitted that the arguments and facts are clear on the face of the record on appeal; this Honorable Court will not need assistance in resolving this action.

## <u>CERTIFICATE OF STYLE AND FONT</u>

This brief is written in 14 point Times New Roman. To the best of Counsel's information and belief, it is 10 pitch.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .......................................................I

STATEMENT REGARDING ORAL ARGUMENT....................................................III

CERTIFICATE OF STYLE AND FONT..............................................................III

TABLE OF CONTENTS ..............................................................................IV

TABLE OF AUTHORITIES..........................................................................VI

STATEMENT OF JURISDICTION ....................................................................1

STATEMENT OF THE ISSUES .......................................................................1

STATEMENT OF THE CASE .........................................................................2

    **(i)**    **Course of Proceedings and Disposition in the Court Below**.........2

    **(ii)**    **Statement of the Facts**.................................................9

    **(iii)**    **Standard of Review**...................................................11

SUMMARY OF THE ARGUMENT...................................................................13

ARGUMENT AND CITATIONS OF AUTHORITY ...............................................15

    **I.**    **THE DISTRICT COURT ERRED IN DENYING THE APPELLANT'S MOTION TO EXCLUDE EVIDENCE OF THE ION SCAN TESTING AT TRIAL**..................................................15

    **II.**    **THE DISTRICT COURT'S ADMISSION AND RELIANCE ON THE STATE DEPARTMENT EXHIBIT IN MAKING THE MDLEA JURISDICTION DETERMINATION VIOLATED THE APPELLANT'S RIGHT TO CONFRONTATION**.................................................19

**III.    THE SENTENCE IMPOSED UPON THE APPELLANT BY THE DISTRICT COURT WAS PROCEDURALLY UNREASONABLE**………………………25

CONCLUSION ....................................................................... 31

CERTIFICATE OF COMPLIANCE ..................................... 31

CERTIFICATE OF SERVICE............................................... 32

# TABLE OF AUTHORITIES

## Cases

*City of Tuscaloosa v. Harcros Chems., Inc.*,
   158 F.3d 548 (11th Cir. 1998) ……………………………………...……16

*Crawford v. Washington*, 541 U.S. 36 (2004)...……………………………*passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)………*passim*

*Gall v. United States*, 552 U.S. 38 (2007)………………………………………...26

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ……………………..……..16

*McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253 (11th Cir. 2002)………....16

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009)………………..….21, 24

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987)………………………………...……22

*Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003) ……………………….……………17, 18

*United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005)……………………….24

*United States v. Bradberry*, 466 F.3d 1249 (11th Cir. 2006)…………………12

*United States v. Breitweiser*, 357 F.3d 1249 (11th Cir. 2004)……………………12

*United States v. Campbell*, 743 F.3d 802 (11th Cir. 2014)……………….12, 22, 23

*United States v. Caraballo*, 595 F.3d 1214 (11th Cir. 2010)……………………24

*United States v. Cruickshank*, 837 F.3d 1182 (11th Cir. 2016)………..…….22, 23

*United States v. De La Garza*, 516 F.3d 1266 (11th Cir. 2008)………….…...20

*U.S. v. Frazier,* 89 F.3d 1501 (11th Cir. 1996)………………………..………...26

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004)…………………17, 18, 19

*U.S. v. Hinds,* 435 Fed. Appx. 832 (11th Cir. 2011)…………..…………………..26

*United States v. Lanzon*, 639 F.3d 1293 (11th Cir. 2011)……………….…………12

*United States v. Lebowitz*, 656 F.3d 1000 (11th Cir. 2012)………..…….…...……11

*United States v. McPhee*, 336 F.3d 1269 (11th Cir. 2003)………………….…12

*United States v. Rodriguez,* 398 F.3d 1291 (11th Cir. 2005)………...………..12

*United States v. Pugh*, 515 F.3d 1179 (11th Cir. 2008)……………………..…....25

*United States v. Tinoco*, 304 F.3d 1088 (11th Cir. 2002)…………………..20, 22

*United States v. Turner*, 626 F.3d 566 (11th Cir. 2010)……………………..……28

*United States v. Vera*, 639 Fed.Appx. 580 (11th Cir. 2016)…… … …… ….… 1 2

*United States v. Wallace*, 425 Fed.Appx. 841 (11th Cir. 2011)………………....28

*United States v. Williams*, 865 F.3d 1328 (11th Cir. 2017)…………………17, 18

*U.S. v. Zapata,* 139 F.3d 1355 (11th Cir. 1998)…………………………...…26

## **Statutes**

Title 18, United States Code, Section 2…………...…………………..…………...2

Title 18, United States Code, Section 3231...……...………………...…………...1

Title 21, United States Code, Section 960……………………………….………2

Title 28, United States Code, Section 1291………………………..……………1

Title 46, United States Code, Section 70501……………………….....………3, 20

Title 46, United States Code, Section 70503………………………....…2, 23

Title 46, United States Code, Section 70506……………………….…………………2

U.S.S.G. § 2D1.1……………………………………………………………………..14

U.S.S.G. § 3C1.1………………………………………………….………..11, 28, 29, 30

**Rules**

FRAP 32(A)(7)(B) ................................................................................. 32

FEDERAL RULE OF EVIDENCE 702 ..................................................... 13, 15, 16

## **STATEMENT OF JURISDICTION**

Title 28 U.S.C. § 1291 provides that the court of appeals shall have jurisdiction of appeals from all final decisions of the district court of the United States except where a direct review may be had in the Supreme Court.

The United States District Court, Middle District of Florida, Tampa Division, had jurisdiction pursuant to Title 18 U.S.C. § 3231. This is an appeal from the Final Judgment entered by the District Court on October 7, 2020. (Doc. 329). Appellant filed his Notice of Appeal on October 14, 2020. (Doc. 334).

## **STATEMENT OF THE ISSUES**

1. Whether the district court erred in denying the Appellant's motion to exclude ion scan evidence following a *Daubert* hearing?

2. Whether the district court violated the Appellant's right to confrontation when it relied on a hearsay document produced by the Department of State for purposes of attempting to establish jurisdiction under the MDLEA and none of the declarants of the statements contained within that document testified at trial?

3. Whether the district court erred when it calculated the guidelines to include a base offense level of 38, where the evidence did not establish an attributable drug weight?

4. Whether the district court erred at sentencing in assessing a two-level Sentencing Guidelines offense level enhancement for obstruction of justice based on the allegation that the Appellant jettisoned cargo prior to any attempt to interdict the boat in question and prior to the United States obtaining jurisdiction over that vessel?

## STATEMENT OF THE CASE

### i.    Course of Proceedings and Disposition in the Court Below

On December 12, 2018, the Appellant and three other individuals were charged by indictment in the United States District Court for the Middle District of Florida, Tampa Division, with one count of knowingly and willfully conspiring to possess with intent to distribute five kilograms or more of a mixture or substance containing cocaine while aboard a vessel subject to the jurisdiction of the United States and one count of possessing with intent to distribute five kilograms or more of a mixture or substance containing cocaine while aboard a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a), 70506(a), (b); 21 U.S.C. § 960(b)(1)(B)(ii); and 18 U.S.C. § 2. (Doc. 28).

The charges stemmed from the Coast Guard's interdiction of a small vessel in international waters approximately 110 miles off the coast of Jamaica. (Doc. 1 at 3). The suspected occupants of the boat had been earlier seen jettisoning bales of what were believed to be cocaine into the water. (Doc. 1 at 3-4). The Coast Guard did not

recover any cocaine from the boat or the waters. (Doc. 1 at 3-5). Ion scans of various areas of the boat and the four occupants of the boat tested positive for cocaine. (Doc. 1 at 3). The four crewmembers were arrested and transported to the Middle District of Florida. (Doc. 1). The Government went on to indict all four, on the two charges set forth above. (Doc. 28).

The Appellant's three co-defendants proceeded to trial on May 6, 2019. (Doc. 217-220). However, the Appellant's trial was severed, and did not take place until January 27, 2020. Prior to the start of trial, the district court held hearings on various pretrial issues. issues. For one, the Government sought a finding that the boat on which the defendants had been present was a "vessel subject to the jurisdiction of the United States," within the meaning of the Maritime Drug Law Enforcement Act, 46 U.S.C. § 70501 et seq. (Doc. 74, 75). Prior to the hearing, the Government had filed a certification from the Department of State that had attached as an exhibit an affidavit from a Coast Guard Commander, David M. Bartram. (Doc. 74-1). Commander Bartram did not testify during the hearing or the trial. Commander Bartram's affidavit was titled "Certification for the Maritime Drug Law Enforcement Act Case Involving Go Fast Vessel Unknown (Without Nationality)." (Doc. 74-1 at 2). The affidavit went on to state that Bartram has been designated by the Department of State to make certifications for MDLEA purposes. (Doc. 74-1 at 1). The affidavit then recounted the interdiction of the go fast vessel on December 1,

2018 and alleged that, on that date, the "Government of the United States" made a request of "the Government of the Republic of Colombia" that it confirm or deny the vessel's registry and then, if confirmed, authorize the boarding and search of the vessel. (Doc. 74-1 at 1). The affidavit gave no indication as to who made the contact with Colombia. (Doc. 74-1). The affidavit then stated that Colombia purportedly "could neither confirm nor refute the vessel's registry or nationality." (Doc. 74-1 at 1). Again, the document did not provide a name of the Colombian official who allegedly responded to the request, nor did it include any documentation or other information to corroborate the alleged response by Colombia. (Doc. 74-1). The admission of the document was objected to on the basis of the Confrontation Clause. (Doc. 247 at 7-8). However, the district court ultimately overruled the objection and found, based on that document, that the vessel was subject to the jurisdiction of the United States. (Doc. 247 at 9).

The Defendants, in addition, had filed a motion in limine to exclude any evidence concerning the aforementioned ion scans that were performed on the boat and the crew members. (Doc. 77). The district court held a *Daubert* hearing on the admissibility of that evidence. (Doc. 206). At that hearing, the Government presented the testimony of Coast Guard Senior Chief Maritime Enforcement Specialist Steven Bomentre. (Doc. 206). Bomentre testified that he has been using ion scan machines manufactured by Smiths Detection since 2007. (Doc. 206 at

19). He was certified by Smiths Detection to train operators of the machine that was used in the instant case, the model 500dt. (Doc. 206 at 19). To qualify as an operator of the 500dt, Bomentre explained, the operator must complete a three day course. (Doc. 206 at 20-21). Bomentre had, in addition, taken a technician course that authorized him to make repairs to machines. (Doc. 206 at 21-23). Bomentre did not participate in the testing that took place in the instant case. (Doc. 108 at 4). He was only able to testify to results of the testing that took place by reviewing documents that contained the testing results. (Doc. 108 at 4).

As to the machine itself, Bomentre testified that its purpose is trace detection of narcotics and explosives. (Doc. 206 at 25). In maritime drug enforcement applications, boarding team members take swabs of various areas that are sought to be tested. (Doc. 206 at 40-41). The machine employs ion mobility spectrometry in which the samples are placed in the machine, the sample is vaporized, turned into a gaseous state and introduced for testing. (Doc. 206 at 33-34, 84). It then receives an electrical charge from nickel 63 - a weak radioactive source. (Doc. 206 at 33-34, 84). The machine then tests how long it takes the substance to get from point A to point B through a drift tube. (Doc. 206 at 33-34, 84). Each specific ion has a different speed at which it travels. (Doc. 206 at 35-36). The speed of a particular ion to be tested for is preset by the manufacturer. (Doc. 206 at 36). If

the speed matches any of the preset substances, the machine will alarm for the presence of that particular substance. (Doc. 206 at 86).

Bomentre testified that the manufacturer published that the machine has a false alarm rate of something less than 1%. (Doc. 206 at 31). The machine does not, however, give any indication if it potentially gives a false positive. (Doc. 206 at 98). The Coast Guard, likewise, does not employ any cross-checking procedure to determine if a machine gave a false positive. (Doc. 206 at 98-99). To work properly, the machine cannot be in a high humidity environment. (Doc. 206 at 91). Similarly, if excessive moisture ended up on a swab, the swab might not test properly. (Doc. 206 at 95). Bomentre also clarified that the machine cannot provide information as to when a substance at issue may have been deposited on the area that was swabbed. (Doc. 206 at 84-85.)

Bomentre did not know the process by which the machine was manufactured. (Doc. 206 at 77-78). He also did not know the life expectancy of the machines. (Doc. 206 at 80). He claimed, however, that the use of the machine was generally accepted as a method for detecting trace amounts of narcotics and that it is used by TSA and potentially other federal agencies. (Doc. 206 at 27). Earlier versions of the machines had been used since the 1960s in Vietnam. (Doc. 206 at 28).

The district court ultimately entered an order denying the motion to exclude the ion scan evidence, finding that the issues raised by the defendants were relevant for cross-examination but did not render the evidence inadmissible. (Doc. 108).

During the Appellant's trial, after the Government presented its case, trial counsel for the Appellant moved for a judgment of acquittal. (Doc. 357 at 131).

> At this time I would move for a judgment of acquittal as to both counts. I would submit that looking at the evidence in the light most favorable to the Government, that the Government has not established a prima facie case. This is a case where no illegal drugs were produced other than something that can't be seen with the naked eye, simply the testimony of the witness regarding the ion scan testing, and certainly there has been insufficient evidence to suggest the amounts that were being alleged regarding the allegation that it's over 5 kilograms of cocaine, and there has been no evidence of any intent to distribute. The only evidence that comes close would be the testimony of Mr. Caceres-Lopez, and I would submit that his testimony is not credible, and I would ask the Court to grant the motion as to both counts.

(Doc. 357 at 131). The district court ultimately denied the motion. Ultimately, at the close of the trial, the jury convicted the Appellant as charged.

The Appellant proceeded to his sentencing hearing, before the Honorable Judge Susan C. Bucklew, on October 7, 2020. The Appellant had a total offense level of 40, making the range of imprisonment 292 to 365 months. (Doc. 351 at 14). The Appellant made three objections concerning the presentence investigation report (PSR). First, the Appellant objected to any use of his post-arrest statements that were made during a proffer. (Doc. 351 at 15). Second, the Appellant objected

7

to the weight of the drugs because there were no drugs retrieved. (Doc. 351 at 16). Lastly, the Appellant objected to the enhancement for obstruction of justice. (Doc. 351 at 16).

The district court ultimately overruled the objections. First, as to the statements made by the Appellant, the court found that because he took a position that was contrary to what he said in the proffer, the court was allowed to entertain and consider those statements at sentencing. (Doc. 351 at 34). Second, the court found that because the jury made the determination as to the amount of drugs, as well as the evidence presented, it was appropriate. (Doc. 351 at 33). Lastly, the court found that the obstruction of justice enhancement was appropriate because the defendants did destroy the evidence against them "by tying the bales to the engines and then sinking the engines." (Doc. 351 at 31). The court found that those facts fit the obstruction of justice enhancement perfectly. (Doc. 351 at 33). After considering argument, the district court sentenced the Appellant to 292 months imprisonment, to be followed by a term of five (5) years supervised release. (Doc. 351 at 53). Following the imposition of his sentence, the Appellant filed his notice of appeal with the Court. The Appellant remains incarcerated today.

### ii.    Statement of the Facts

The events leading up to the instant case occurred began when a Coast Guard airplane spotted a small vessel in international waters off of Jamaica. The boat had a red tarp covering it as a makeshift roof. (Doc. 354 at 198). While being surveilled, the boat would travel underway in a north-northeast direction and then stop periodically. (Doc. 354 at 199). During this period of time, for approximately 45 minutes to an hour, the Coast Guard observed white packages coming out of the side of the vessel, in large groups. (Doc. 354 at 200-202). The Coast Guard plane watched and recorded the boat for two and a half, to three and a half hours. (Doc. 354 at 200). Ultimately, the Coast Guard departed and passed its position to the cutter with the Coast Guard Law Enforcement Detachment on it. (Doc. 354 at 188).

Later that evening, the vessel was approached and contact was finally made. (Doc. 355 at 28). Four individuals were seen on the vessel, trying to conceal themselves with clothes over top of their heads. (Doc. 354 at 29).

> We noticed the Panga was dark in color, blending in with the environment. There was no navigation lights. There was multiple fuel drums on deck, they were all about 55-gallon fuel drums, so bigger fuel drums on deck. They had lines that were frayed and cut hanging off the side of the vessel as well, and we noticed the vessel had no engines on board.

(Doc. 355 at 29). During conversations with the individuals, it was learned that three of them were Colombian and one was from Belize. (Doc. 355 at 30). The boat did not have any registration on it, nor did it have any indicia or indication of its

nationality. (Doc. 355 at 31). It was determined that the Appellant was "the master" or captain. (Doc. 355 at 31).

The Appellant indicated that they had been fishing for mahi and diving for conch. (Doc. 355 at 35). The Coast Guard alleged that no fishing or diving equipment was on board. (Doc. 355 at 76-77). A snorkel was found on the boat, however. (Doc. 355 at 110). The Appellant further indicated that their boat has been adrift for the last six days after having engine troubles. (Doc. 355 at 78). They had been using the engines as anchors after running into the engine troubles, the captain explained. (Doc. 355 at 78-79). At some point, however, the lines holding the engines snapped and the engines were lost. (Doc. 355 at 78).

The Coast Guard went on to board the boat. (Doc. 355 at 100). It took ion scan swabs of the boat. (Doc. 355 at 100). It would also later swab the crewmembers' hands and forearms. (Doc. 355 at 100-101). Swabs from various areas of the boat, the swabs of the four individuals' hands, and the swab of the Appellant's forearm alerted for cocaine. (Doc. 355 at 155, 158-59). The alerts were all for 8% or less cocaine. (Doc. 355 at 196-205). The Coast Guard found no contraband on the boat. In addition to the foregoing, the Government presented a recording of the surveillance video from the Coast Guard plane. Additionally, several of the Government's witnesses opined that the white packages that had been thrown

overboard were bales of contraband – specifically cocaine. (Doc. 355 at 87, 115, 206).

Following trial, but prior to sentencing, United States Probation did a presentence investigation report. Therein, it adjusted the Appellant's total offense level for obstruction of justice and took the amount of cocaine into consideration. As for the adjustment for obstruction of justice, the report recommended:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by two levels. USSG §3C1.1. The defendants, while aiding and abetting each other, intentionally destroyed the most incriminating evidence against them when they jettisoned 38 bales of cocaine weighing approximately 760 kilograms from the GFV and successfully destroyed this evidence by tying the bales to the GFV engines, jettisoning the engines, and sinking all of the cocaine and engines to the ocean floor. This progression took over two hours to complete and occurred several hours before the Coast Guard boarding team arrived on scene. Thus, the evidence destruction did not occur contemporaneous with their detention and eventual arrest by federal authorities. Therefore, the offense is increased by two levels.

PSR at ¶ 22.

### iii.    Standard of Review

As to Issue One, this Court reviews a district court's evidentiary rulings for abuse of discretion. The factual findings underlying those rulings are reviewed for clear error. *United States v. Lebowitz*, 656 F.3d 1000, 1009 (11th Cir. 2012) (*citing*

*United States v. Lanzon*, 639 F.3d 1293, 1300 (11th Cir. 2011)). The complaining party must show that the court's ruling had a "substantial prejudicial effect." *United States v. Breitweiser*, 357 F.3d 1249 (11th Cir. 2004).

As to Issue Two, this Court reviews rulings on constitutional objections, including objections on Confrontation Clause grounds, *de novo*. *United States v. Campbell*, 743 F.3d 802, 805 (11th Cir. 2014).

As to Issue Three, a review of a trial court's factual determination as to the weight of drugs attributable to a particular defendant is limited to clear error. *See U.S. v. Rodriguez,* 398 F.3d 1291, 1296 (11th Cir. 2005). Further, "[i]n determining whether the district court applied correctly an obstruction-of-justice enhancement, [this Court] review[s] for clear error the district court's factual findings and review[s] *de novo* the court's application of the guidelines to those facts." *United States v. Vera*, 639 Fed.Appx. 580, 580 (11th Cir. 2016) *citing United States v. Bradberry*, 466 F.3d 1249, 1253 (11th Cir. 2006). "Under the clearly erroneous standard, [the Court] must affirm the district court unless review of the entire record leaves [it] with the definite and firm conviction that a mistake has been committed." *Id. citing United States v. McPhee*, 336 F.3d 1269, 1275 (11th Cir. 2003) (quotation omitted in original).

## SUMMARY OF THE ARGUMENT

The district court abused its discretion when it denied the Appellant's motion to exclude the ion scan testing evidence following a *Daubert* hearing. While the Government presented a witness who had ample experience operating the ion scan machine that was used in this case, it failed to present evidence to establish that the ion testing procedure was itself the product of reliable scientific principles and methods. In the end, the denial of the motion to exclude that evidence was a misapplication of Rule 702 and resulted in a violation of the Appellant's rights to due process and a fair trial.

The district court's admission and reliance on the affidavit attached to the Government's Department of State document violated the Appellant's constitutional right to confrontation. The Government offered that document into evidence without calling as witnesses the affiant of the document in question or any of the individuals who allegedly communicated between the United States and Colombia. The district court should have, thereby, sustained the Appellant's objection to the admissibility of the document on Confrontation Clause grounds. Had the court precluded that document from evidence, the Government could not have proven jurisdiction under the MDLEA and the Government's case would have been subject to a judgment of acquittal.

Lastly, the facts of the instant case do not support a base level of 38 because the Government did not establish by a preponderance of the evidence that the weight of the drugs attributable to the Appellant was greater than 450 Kilograms pursuant to U.S.S.G. §2.D1.1(c). The jury convicted the Appellant of possession and conspiracy to possess 5 Kilograms of cocaine or more, and because there is no feasible manner of calculating actual possession without speculation, the appropriate base level was 30 pursuant to U.S.S.G. §2.D1.1(c). Additionally, the district court further erred when it applied a two-level enhancement for obstruction of justice. The facts as presented did not support a two-level enhancement. As a result, this Court should find that the Appellant is at least entitled to be resentenced accordingly.

## ARGUMENT AND CITATION OF AUTHORITY

**I.    THE DISTRICT COURT ERRED IN DENYING THE APPELLANT'S MOTION TO EXCLUDE EVIDENCE OF THE ION SCAN TESTING AT TRIAL**

The district court abused its discretion when it denied the Appellant's motion to exclude the ion scan testing evidence following a *Daubert* hearing. While the Government presented a witness who had ample experience operating the ion scan machine that was used in this case, it failed to present evidence to establish that the ion testing procedure was itself the product of reliable scientific principles and methods. In the end, the denial of the motion to exclude that evidence was a misapplication of Rule 702 and resulted in a violation of the Appellant's rights to due process and a fair trial.

Federal Rule of Evidence 702 addresses the admissibility or inadmissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In the landmark opinion, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the

Supreme Court tasked district courts with performing the "gatekeeper" function of assessing whether proposed expert testimony meets the standards of Rule 702. A few years after deciding *Daubert*, the Court clarified that the *Daubert* gatekeeper function, is not limited to scientific testimony and opinions, but rather, applies to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This Court has further found that the *Daubert* gatekeeping "function 'inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) *quoting McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

Consistent with the foregoing principles, this Court has set out the three-pronged inquiry for courts to follow in determining the admissibility of testimony under Rule 702:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 *quoting City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794).

As to the reliability of the witness' testimony, the Court has provided the following framework for evaluating the reliability of scientific expert opinion:

(1)  whether the expert's theory can be and has been tested;
(2)  whether the theory has been subjected to peer review and publication;
(3)  the known or potential rate of error of the particular scientific technique; and
(4)  whether the technique is generally accepted in the scientific community.

*Frazier*, 387 F.3d at 1262 *quoting Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd*., 326 F.3d 1333, 1341 (11th Cir. 2003). It has further held that the party proffering the expert testimony always bears the burdens of proving the "qualification, reliability, and helpfulness" of the proposed expert opinion. *Id.*

In the aforementioned *United States v. Williams*, 865 F.3d 1328, this Court reviewed the admission of ion scan testing that was presented in an MDLEA case. That case involved an expert witness other than Steven Bomentre. The appellants in that case challenged the proposed expert's "qualifications to interpret IonScan test results, the relevance of his opinions to the issues in this case, and whether the nature of his testimony was overly prejudicial." *Id.* at 1338.  In deciding that case, however, the Court noted that the defendants did not challenge the reliability of the ion scan technology itself. *Id*. at 1139, n.7.  This Court found that the expert in that case "was qualified by his training and experience to testify to the results of the IonScan testing." It went on to provide "[a]lthough [the expert's] qualifications may have

been imperfect, the district court did not err in finding that any defects were slight enough that the defendants could explore them on cross examination. The district court did not abuse its discretion in finding [the expert] qualified as an expert on the interpretation of IonScan testing." *Id.* at 1340.

In the instant case, the main question that the Government left unanswered at the *Daubert* hearing was whether the testimony concerning the ion scan evidence was "the product of reliable principles and methods." As this Court has found "'while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability.... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony.'" *Frazier*, 387 F.3d at 1263 *quoting Quiet Tech*, 326 F.3d 1341-42. While Bomentre, like the expert at issue in *Williams*, was qualified to testify to the process for conducting ion scans, he could not establish the reliability of the ion scan testing procedure itself. Bomentre was able to testify as to how the machine was used, but he could not establish that the process the machine employed was sufficiently reliable. While he could regurgitate the manufacturer's claim that the machine had an error rate of less than 1%, he could not present any testimony as to how the manufacturer determined that alleged error rate. Even more troubling, he testified that the Coast Guard has no cross-checking procedure in effect to determine when any false positive test

results occur. Consequently, if the ion scan testing method was not sufficiently reliable itself, then Bomentre's testimony concerning the testing process and the results would be inherently unreliable.

In the end, the Government presented no competent evidence to show the reliability of the ion testing procedure that the machine employs. As a result, the district court should have found that the evidence was not admissible. Without that evidence, the Government would not have been able to prove its case beyond a reasonable doubt. As a result, this Court should find that this abuse of discretion, and prejudicial result, requires a new trial on the Appellant's behalf.

## II.      THE DISTRICT COURT'S ADMISSION AND RELIANCE ON THE STATE DEPARTMENT EXHIBIT IN MAKING THE MDLEA JURISDICTION DETERMINATION VIOLATED THE APPELLANT'S RIGHT TO CONFRONTATION

The district court's admission and reliance on the affidavit attached to the Government's Department of State document violated the Appellant's constitutional right to confrontation. The Government offered that document into evidence without calling as witnesses the affiant of the document in question or any of the individuals who allegedly communicated between the United States and Colombia. The district court should have, thereby, sustained the Appellant's objection to the admissibility of the document on Confrontation Clause grounds.

Had the court precluded that document from evidence, the Government could not have proven jurisdiction under the MDLEA and the Government's case would have been subject to a judgment of acquittal.

Because the instant charges arose on international waters aboard a non-U.S. flagged vessel, the Government bore the burden of proving that the vessel at issue was a vessel subject to the jurisdiction of the United States under the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. 70501 *et. seq.*,. *United States v. De La Garza*, 516 F.3d 1266, 1271 (11th Cir. 2008); *United States v. Tinoco*, 304 F.3d 1088, 1114 (11th Cir. 2002). The MDLEA provides that a "vessel subject to the jurisdiction of the United States" includes—

> (A)   a vessel without nationality;
> (B)   a vessel assimilated to a vessel without nationality under paragraph (2) of article 6 of the 1958 Convention on the High Seas;
> (C)   a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States;
> (D)   a vessel in the customs waters of the United States;
> (E)   a vessel in the territorial waters of a foreign nation if the nation consents to the enforcement of United States law by the United States; and
> (F)   a vessel in the contiguous zone of the United States, as defined in Presidential Proclamation 7219 of September 2, 1999 (43 U.S.C. 1331 note), that—
> > i.    is entering the United States;
> > ii.   has departed the United States; or
> > iii.  is a hovering vessel as defined in section 401 of the Tariff Act of 1930 (19 U.S.C. 1401).

46 U.S.C. § 70502(c)(1). The MDLEA similarly holds that a "vessel without nationality" includes--

(A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed; (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. § 70502(d)(1).

In light of *Crawford v. Washington*, testimonial evidence is inadmissible against a defendant unless a) the declarant appears at trial or b) the declarant is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 54, 124 S.Ct 1354, 1365-66, 158 L.Ed.2d 177 (2004). In deciding *Crawford*, the Supreme Court held that testimonial evidence included, among many other classes of evidence, "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52. The Supreme Court, furthermore, recently addressed whether the Confrontation Clause applied to the admission of affidavits reporting the results of forensic analyses of substances believed to be illegal drugs. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 307 129 S. Ct. 2527, 2530, 174 L.Ed.2d 314 (2009). The Court ultimately found that such documents were well within the "core class of testimonial statements" that implicate Confrontation Clause protections. *Id.* at 2532. In reaching its holding, the

Court relied on the fact that the documents in question contained "a solem declaration or affirmation made for the purpose of establishing or proving some fact." *Id. citing Crawford*, 541 U.S. at 51 (internal quotations omitted).

Long before *Crawford*, the Supreme Court held that the right to confrontation is a trial right. *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 107 S.Ct 989, 999, 94 L.Ed.2d 40 (1987). Consequently, the right typically does not attach in pre-trial settings. As set forth above, however, the MDLEA requires that the trial court make a determination of the statutory element of jurisdiction. The MDLEA, therefore, essentially requires that the Government prove an element of a criminal offense as a matter of law, most often prior to trial. The Appellant recognizes that this Court has held that the use of such documents for purposes of proving MDLEA jurisdiction does not implicate the right to confrontation because the MDLEA jurisdictional determination "does not pertain to an element of the offense." *United States v. Campbell*, 743 F.3d 802, 806 (11th Cir. 2014); *see also United States v. Cruickshank*, 837 F.3d 1182, 1188, 1192 (11th Cir. 2016), (adhering to *Campbell* and finding that the MDLEA confrontation issue was "foreclosed by our prior precedent"). In reaching that holding, this Court reasoned that the MDLEA "jurisdictional requirement 'is unique because it is not meant to have any bearing on the individual defendant, but instead is meant to bear only on the diplomatic relations between the United States and foreign governments.'" *Id.* at 808 *quoting Tinoco*,

304 F.3d at 1109. As such, the Court found that the jurisdictional determination was not tantamount to the proof of an element at trial. *Id.*

While recognizing this Court's decisions in *Campbell* and *Cruickshank*, the Appellant respectfully submits that the MDLEA jurisdictional element is the functional equivalent of an element of the proscribed offense. When, in 1996, Congress made the decision to remove the jurisdictional element of the MDLEA from the province of the jury, it did not remove the jurisdictional element from the language of the substantive criminal offense. *See* 46 U.S.C. § 70503 (proscribing offenses committed on "a vessel of the United States or a vessel subject to the jurisdiction of the United States." *Id.* at (a)(1)). As a result, jurisdiction remains a material element to be proven by the Government as a prerequisite to a conviction under the MDLEA. That element must, however, now be proven to the district court prior to trial, rather than to the jury during the trial. Proof of that element is the Government's gateway to trial in MDLEA cases.

Therefore, because jurisdiction remains a critical statutory prerequisite to an MDLEA prosecution, the Appellant respectfully submits that the right to confrontation must attach during the MDLEA determination of jurisdiction. If the right to confrontation does not attach, so as to provide defendants with a means to challenge the legality of a claim of jurisdiction, then the jurisdictional element is futile.

The document from the Department of State that the Government relied on, like the *Melendez-Diaz* affidavits, was clearly a "declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* Moreover, that document was not merely maintained in the regular course of the Department's business, but instead, was a document that the Government prepared for the explicit purpose of attempting to establish its jurisdiction over the instant case. The sole purpose for that document was, consequently, to prove some fact in the litigation of the instant case. *See United States v. Caraballo*, 595 F.3d 1214, 1228 (11th Cir. 2010) (recognizing that the question of whether evidence is testimonial for hearsay purposes turns on whether the document or statement in question was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id quoting United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005). Correspondingly, when the Coast Guard Commander prepared the affidavit and the Department of State, in turn, prepared its corresponding document to the Government, all persons who assisted in the creation of the document certainly would have expected the Government to be using that document in the instant prosecution. As a result, pursuant to *Crawford*, the document was clearly testimonial in nature and was, thereby, subject to exclusion from evidence under the Confrontation Clause.

24

The error in admitting the Department of State jurisdictional document was clearly harmful. Without that document, the Government could not have established compliance with the MDLEA or international maritime law. Consequently, were it not for the admission of the jurisdictional document, the Government would not have been able to prove a material element of its case. As a result, the admission of that document violated the defendants' constitutional right to confrontation.

### III.    THE SENTENCE IMPOSED UPON THE APPELLANT BY THE DISTRICT COURT WAS PROCEDURALLY UNREASONABLE

The sentence imposed upon Appellant by the district court was not procedurally reasonable, because the district court used an incorrect base offense level and erroneously applied a two-level enhancement for obstruction of justice. The Appellant is entitled to be resentenced accordingly.

The sentence imposed by the district court is reviewed for "reasonableness," which "merely asks whether the trial court abused its discretion." *Pugh*, 515 F.3d at 1189 (quoting *Rita*, 551 U.S. at 351). In reviewing sentences for reasonableness this Court performs two steps. *Pugh*, 515 F.3d at 1190. First, this Court must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence –

including an explanation for any deviation from the Guidelines range." *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

First, the district court erred by using a base offense level of 38, instead of 30, where the Government failed to establish an attributable drug weight of 450 kilograms or more of cocaine. "Where there is no drug seizure…the court shall approximate the quantity of the controlled substance." *See id.* quoting *U.S. v. Frazier,* 89 F.3d 1501, 1506 (11th Cir. 1996). In estimating quantity, the court may consider evidence of average frequency and/or amount of a defendant's drug sales over a given period of time. *See id.* As such, sentencing may "be based on fair, accurate, and conservative estimates of the quantity of drugs attributable to a defendant." *See id.* quoting *U.S. v. Zapata,* 139 F.3d 1355, 1359 (11th Cir. 1998). Although the court is permitted to estimate quantity, the court is prohibited from speculating to establish weight. *See U.S. v. Hinds,* 435 Fed. Appx. 832, 837-8, (11th Cir. 2011).

Here, no cocaine was recovered and the only actual cocaine directly attributable to the Appellant was the result of the ION scans. The verdict reflected a jury finding as to 5 kilograms of cocaine, and the associated Base Level for 5 kilograms of cocaine is level 30 pursuant to §2.D1.1(c). Level 38 requires a finding that the Appellant was in possession of 450 kilograms or more of cocaine, and

the Government's evidence was wholly insufficient to establish such a weight absent a reliance upon speculation.

In overruling the Appellant's objection to Base Level 38, the court relied upon video surveillance depicting the jettisoning and post-arrest statements made by the Appellant and his co-defendants. The video surveillance depicted the Defendants jettisoning objects into the water from thousands of feet in distance. No witness testified to actual knowledge of the contents or the weight of the objects. To the contrary, the Government relied entirely upon law enforcement opinion testimony indicating that the bales were consistent with cocaine, and that common bales are approximately 20 kilograms in weight. If the Defendants jettisoned 30 bales of cocaine each weighing 20 kilograms, the Government established its burden; however, there is no evidence that each bale contained cocaine or that each bale weighed at least 20 kilograms.

It is respectfully submitted that aerial observations, from thousands of feet away, coupled with the opinion testimony of general practice cannot establish the actual weight of cocaine. As such, the Government has not met its burden of proof, and because the court relied upon impermissible PSR statements and insufficient evidence to apply Base Level 38, there is clear error and this Court should reverse for a new sentencing hearing applying the proper base offense level of 30.

In addition to the erroneous base offense level, the district court further erred when it applied a two-level enhancement for obstruction of justice. U.S.S.G. § 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

The Government bears the burden of proving by a preponderance of the evidence at sentencing that the defendant willfully obstructed justice within the purview of section 3C1.1 in order to support the application of that enhancement. *United States v. Wallace*, 425 Fed.Appx. 841 (11th Cir. 2011) *citing United States v. Turner*, 626 F.3d 566, 572 (11th Cir. 2010). The commentary to section 3C1.1 further provides:

> 1. In General.-- This adjustment applies if the defendant's obstructive conduct (A) occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant. Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction…

U.S.S.G. § 3C1.1 cmt. n.1.

The commentary goes on to state "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness" and then provides examples of conduct that may or may not qualify as obstructive conduct under the Guideline. U.S.S.G. §

3C1.1 cmt. n.3. As examples of conduct that is intended to be considered obstruction

of justice under section 3C1.1, the commentary states:

> (D) destroying or concealing or directing or procuring another person
> to destroy or conceal evidence that is material to an official
> investigation or judicial proceeding (e.g., shredding a document or
> destroying ledgers upon learning that an official investigation has
> commenced or is about to commence), or attempting to do so; however,
> if such conduct occurred contemporaneously with arrest (e.g.,
> attempting to swallow or throw away a controlled substance), it shall
> not, standing alone, be sufficient to warrant an adjustment for
> obstruction unless it results in a material hindrance to the official
> investigation or prosecution of the instant offense or the sentencing of
> the offender…

U.S.S.G. § 3C1.1 cmt. n.4(D). The Guideline later provides the following

definition: "'Material' evidence, fact, statement, or information, as used in this

section, means evidence, fact, statement, or information that, if believed, would

tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 cmt.

n.6.

 In the instant case, the jettisoning of packages did not occur

contemporaneous with arrest.  To be sure, it occurred several hours prior even to

the interdiction of the boat.  At the point when the packages were interdicted, a

Coast Guard plane was merely surveilling the boat.  While the crew was

admittedly aware of the boat, it could not have had reason to believe that it

was subject to any form of formal investigation or arrest that point. The airplane,

moreover, was making attempts not to be seen and was keeping a sufficient

distance from the boat so as to minimize detection. As a result, at the time when the packages were jettisoned, no "official investigation or prosecution" yet existed. U.S.S.G. § 3C1.1 cmt. n.4(D). The jettisoning of packages could not, therefore, support an obstruction of justice enhancement under section 3C1.1.

In addition, at the time the packages were jettisoned, the United States had no jurisdiction over the boat at issue or its crew. As set forth in previous arguments above, the Government could not exercise jurisdiction over the vessel unless and until it was determined to be a vessel without nationality or its country of registry consented to the exercise of jurisdiction. At the time that acts underlying the alleged obstruction occurred, the Government had no jurisdiction over the vessel at issue. The vessel was, moreover, in international waters and had no connection whatsoever to the United States. Therefore, not only was no "official investigation or prosecution" in existence when the packages were jettisoned, the Government lacked jurisdiction as a matter of law to even conduct such an official investigation or prosecution at the time of the jettisoning. Given those factors, the district court clearly erred in overruling the objections to the obstruction of justice enhancement, requiring reversal and a new sentencing hearing.

## **CONCLUSION**

Based upon the argument and citation to authority set forth above, the Appellant's cause should be reversed and remanded accordingly. In the alternative, the Appellant is entitled to be resentencing.

Respectfully submitted,

By: /s/ Mark J. O'Brien
        Mark J. O'Brien, Esquire
        O'Brien Hatfield Reese, P.A.
        511 West Bay Street, Suite 330
        Tampa, Florida 33606
        (813) 228-6988
        Florida Bar No. 0160210

## **CERTIFICATE OF COMPLIANCE**

I HEREBY CERTIFY that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B).

This brief contains 7,366 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

By: /s/ Mark J. O'Brien
        Mark J. O'Brien, Esquire
        Florida Bar No. 0160210

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing Initial Brief was filed

on the CM/ECF system which will then provide a copy to counsel of record on this

the 3rd day of January 2022.

By:  /s/ Mark J. O'Brien
         Mark J. O'Brien, Esquire
         Florida Bar No. 0160210